UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| HEIDI M. TURNER, | CASE NO. 1:10CV845 |
| Plaintiff, | |
| v. | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY, | MEMORANDUM OPINION AND ORDER |
| Defendant. | |

Heidi M. Turner ("Plaintiff") seeks judicial review of the final decision of Michael J. Astrue ("Defendant"), Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the Court AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint with prejudice:

## I. PROCEDURAL AND FACTUAL HISTORY

On January 12, 2006, Plaintiff protectively applied for SSI, alleging disability beginning December 17, 2005. Tr. at 68-71. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 24-25. On March 6, 2007, Plaintiff filed a request for an administrative hearing. Tr. at 11-12. On February 5, 2009, an ALJ conducted an administrative hearing *via* video conference where Plaintiff was represented by counsel. Tr. at 330-371. At the hearing, the ALJ accepted the testimony of Plaintiff and Bonnie Martindale, a vocational expert ("VE"). On September 15, 2009, the ALJ issued a Decision ("Decision") denying benefits. Tr. at 13-23. Plaintiff filed a request for review, Tr. at 11-12, which the Appeals Council denied. Tr. at 5-7.

On April 21, 2010, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On December 3, 2010, Plaintiff filed a brief on the merits. ECF Dkt. #9. On March 3, 2011, Defendant filed a brief on the merits. ECF Dkt. #12. No reply brief was filed.

**II.**   **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from attention deficit hyperactivity disorder (ADHD), mood disorder (bipolar), and post traumatic stress disorder (PTSD), which qualified as severe impairments under 20 C.F.R. §416.921 *et seq.* Tr. at 18. Although there was evidence in the record that Plaintiff had a history of substance abuse disorder that required inpatient treatment in 2005, Plaintiff testified that she had not abused drugs since her 2005 hospitalization. As a consequence, the ALJ concluded that her substance abuse disorder constituted a non-severe impairment. The ALJ next determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 12.02. 12.04, and 12.06 ("Listings"). Tr. at 19-20. She ultimately concluded that Plaintiff has the residual functional capacity ("RFC") to perform the full range of work at all exertional levels, but with the nonexertional limitations that she can only perform unskilled work that does not entail production lines or more than minimal interaction with the general public. Tr. at 20.

**III.**   **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to SSI benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age,

> education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, __ F.3d __, 2011WL 274792, *3, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V. ANALYSIS

Plaintiff advances two arguments in this appeal. First, Plaintiff contends that the ALJ substituted her own lay opinion when she concluded that Plaintiff did not meet the listings for affective disorder at step three. Plaintiff further argues that the ALJ should have had a medical expert at the hearing.

With respect to Plaintiff's first argument, the regulations provide a "special technique" for evaluating the severity of a mental impairment at steps two and three. 20 C.F.R. §404.1520a(a). This special technique must be followed at each level in the administrative review process. Id.

At step two, an ALJ must evaluate Plaintiff's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment(s)." 20 C.F.R. §404.1520a(b)(1). If the claimant has a medically determinable mental impairment, the ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" with respect to "four broad functional areas": "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§404.1520a(b)(2), (c)(3). These four functional areas are commonly known as the "B criteria." See 20 C.F.R. pt. 404, subpt. P, app. 1, §12.00 et seq. The degree of limitation in the first three functional areas is rated using the following five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. §404.1520a(c)(4). The degree of limitation in the fourth functional area (episodes of decompensation) is rated using the following four-point scale: none, one or two, three, four or more. Id. If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled. 20 C.F.R. §404.1520a(d)(1). Otherwise, the impairment is considered severe and the ALJ will proceed to step three. 20 C.F.R. §404.1520a(d)(2).

At step three, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." Id. The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §404.1525(a). In other words, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §404.1525(c)(3). A claimant must satisfy all of the criteria to meet the listing. Id. Under section 12.04 (Affective Disorders), the A criteria are satisfied by medical documentation of bipolar syndrome with a history of episodic periods. 20 C.F.R. pt. 404, subpt. P,

app. 1, §12.04. Evidence of persistent disturbances of mood or affect is sufficient to satisfy the A criteria of the other relevant listing in this case, section 12.08 (Personality Disorders). The B criteria of both listings are satisfied by a showing of at least two of the following functional limitations: (1) a marked restriction of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.[1] *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess Plaintiff's RFC and move on to steps four and five. 20 C.F.R. §404.1520a(d)(3).

Importantly, the regulations require an ALJ to document the application of this special technique in the written decision. 20 C.F.R. §404.1520a(e). The ALJ must "incorporate the pertinent findings and conclusions based on the technique." 20 C.F.R. §404.1520a(e)(2). The decision must refer to the "significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." *Id.* The decision must also "include a specific finding as to the degree of limitation in each of the functional areas." *Id.* At step three, the ALJ's decision must "record the presence or absence of the criteria [of the listing] and the rating of the degree of functional limitation." 20 C.F.R. §404.1520a(d)(2).

According to medical records from Rainbow Babies and Children's Hospital, Plaintiff was diagnosed with "ADHD without hyperactivity" in June 1999 at the age of eleven and was treated with Adderall. Tr. at 198. Plaintiff's symptoms, as reported by her mother, were having too many imaginary friends, talking to inanimate objects, and misbehaving at school. Tr. at 191-198. Her parents divorced when she was three years old, and she saw her father approximately once a year. The medical records reflect that she fought constantly with her 14-year-old sister, but that she got along well with her mother. Tr. at 195.

---

[1] Even if a claimant does not meet the B criteria, he or she will still satisfy section 12.04 if he or she meets the C criteria. See 20 C.F.R. pt. 404, subpt. P, app. 1, §12.04.

-5-

In April 2004, Plaintiff was hospitalized for a week at Windsor Hospital when she was sixteen years old. Plaintiff was admitted for inpatient psychological treatment after she smoked marijuana, took an overdose of muscle relaxants, and then went to school. Tr. at 140. During her hospitalization, Plaintiff revealed that her father, who reappeared in her life at some point, began molesting her when she was thirteen years of age. Tr. at 162-167. Between the ages of thirteen and fifteen, Plaintiff was molested by her father and his friends. During her inpatient treatment, Plaintiff also discussed her history of drug abuse, which included marijuana and cocaine. She claimed that her father had introduced her to drugs. Tr. at 164-166. Dr. Gary Waltz, a psychaitrist, reported in her discharge summary from Windsor that Plaintiff had been diagnosed with mood disorder and polysubstance abuse, but that she was coming to terms with her molestation.

Paxil was prescribed to address Plaintiff's mood swings. Tr. at 146. However, Paxil made her sleepy during the day, so she was prescribed Adderall. After adding Adderall, Plaintiff reported problems sleeping, so she was prescribed a series of sleeping agents. Because the medications failed to improve Plaintiff's behavior her physicians suspected bipolar disorder. At that time, Plaintiff was prescribed Risperdal, in addition to Paxil and Adderall, and she progressively stopped taking Sonata, which was prescribed to help her sleep. Tr. at 179. Plaintiff did not respond well to Risperdal, and in January 2006, Lithobid 300 mg. was substituted. Tr. at 180. In February 2006, Plaintiff began taking Paxil in the evening, which resolved her sleeping problems. Her Lithobid was increased to 450 mg twice a day.

In February 2006, Plaintiff's family doctor, Dr. Daria Cerimele reported that Lithobid "has really made an improvement in her mood." Tr. at 180. Dr. Cerimele wrote, "She is nearly euthymic.[2] Her affect is appropriate. She answers questions appropriately. Her thought process is much more logical and congruent whereas before she would demonstrate some flight of ideas and some pressured speech and just sort of this inability to listen and to explain reasons for her

---

[2] The term "euthymic" refers to a normal, non-depressed reasonably positive mood. The term is used to refer to the neutral mood (absence of a depressive or manic cycle) that some people with bopolar disorder experience with varying frequency.

-6-

thinking." Tr. at 180. Medical records further indicated that Plaintiff was slowly decreasing Adderall.

Despite the effectiveness of the medication, Dr. Cerimele noted that "she does have some inability to concentrate on activities, although, again, this has been improving with the treatment for the bipolar disorder." Tr. at 180. Dr. Cerimele concluded that Plaintiff had no restrictions on her daily life, although she expressed concern about Plaintiff's impulsiveness and her problems getting along with family members and acquaintances at school. Dr. Cerimele was confident that Lithobid would improve Plaintiff's ability to deal with stress and that she would be "a lot less likely to be set off by little irritations." Tr. at 180. She diagnosed bipolar disorder, attention deficit disorder and anger management. Tr. at 181.

A state agency psychologist, Dr. Kevin Goeke, reviewed Plaintiff's medical records in May 2006 and concluded that Plaintiff was not significantly limited in most areas of mental functioning, but had moderate limitations in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and would have difficulty completing a normal workweek, interacting appropriately in public, getting along with coworkers and peers, and responding appropriately in a work setting. Tr. at 209-211. On May 8, 2007, John Waddell, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records and affirmed Dr. Goeke's assessment. Tr. at p. 303.

Plaintiff discovered that she was pregnant in May 2006. Tr. at 247. Plaintiff began treatment with Dr. Sarbjot Ajit at Community Counseling Center ("CCC") on August 30, 2006, when she was six months pregnant. According to the initial assessment from CCC, Plaintiff was taking Paxil, Adderall, and Lithium, but stopped taking Lithium in May 2006 because of her pregnancy. Tr. at 216, 230. As a result, she was struggling to control her moods and temper when she first began treatment at CCC. She admitted that she had been acting aggressively, having thrown knives at her sister, on some days and but was currently in the midst of a three week depression brought on by a chance meeting with her ex-boyfriend (and the father of her unborn child) at a local fair. She reported that when she was neither manic or depressed, she was easily distracted, forgetful, agitated, and has a hard time keeping still. Oddly, she reported that her first

-7-

sexual encounter was at the age of fifteen and it was consensual. Tr. at 217.

According to Dr. Ajit's notes from September 2006, Plaintiff was doing well with her pregnancy and denied suicidal ideation and self mutilation. Tr. at 230. Plaintiff had self-mutilated in the past to relieve stress, but stopped approximately one year ago. Plaintiff said that she needed chaos in her interpersonal relationships otherwise she becomes bored. Plaintiff was aware of the risk to the fetus but refused to discontinue Paxil despite pressure from Dr. Ajit. Tr. at 229.

Based upon Dr. Ajit's concerns, Plaintiff discontinued Paxil prior to her October 4, 2006 appointment. Plaintiff was hypomanic at her appointment and informed Dr. Ajit that she had not slept well for the last six nights. Tr. at 228. Because Dr. Ajit believed that Plaintiff's problems would be better addressed by a mood stabilizer, he prescribed Lithium. He was less concerned about harm to the baby with Lithium since Plaintiff was in her third trimester. Plaintiff reported that her mood had stabilized at her October 27, 2006 appointment. Tr. at 227.

Plaintiff restarted Paxil and Adderall after giving birth to her daughter. She specifically asked to resume Adderall because it helped control her ADHD. In his December 14, 2006 notes, Dr. Ajit indicated that Plaintiff was feeling overwhelmed as a result of caring for a newborn and was bottle-feeding her daughter. Tr. at 226. Dr. Ajit's notes from Plaintiff's January 2007 appointment indicate that Plaintiff was doing well, and was not depressed or irritable. Tr. at 225. Plaintiff's relationship with her boyfriend was good and she was not suffering any side effects from her medication. She was alert, oriented and exhibited good eye contact and normal thought content and process.

At her February 2007 appointment, Plaintiff described mounting stress resulting from caring for her child and living with her friends. Tr. at 224. Plaintiff's relationship with her mother was another stressor. She was having difficulty sleeping due to having to care for the child in the middle of the night. She stated that she needed "more time to spend outside" and was looking forward to going back to school. She expressed similar feelings in March 2007. Tr. at 223. Plaintiff claimed that she worried about caring for her daughter as well as her finances. Dr. Ajit increased Plaintiff's daily dosage of Paxil and added a low dose of Clonazepam to control anxiety.

Dr. Ajit's notes from Plaintiff's April 2007 appointment indicate that Plaintiff was discontinuing Lithobid and reducing Adderall in favor of Lamictal, which Dr. Ajit considered a better mood stabilizer, and Celexa. Tr. at 318. In April and May 2007, Plaintiff stated that she was anxious about her GED and was experiencing some depression. Tr. at 318-19. In June 2007, she reported interpersonal problems with her family relationships but was not suffering any side effect as a result of her new medications. Tr. at 317.

Although Plaintiff struggled with depression in the next few months, she reported at her July appointment that she got a job at Wal-Mart and was enjoying work. Tr. at 315. In late 2007 and throughout 2008, Plaintiff began periodically stopping her medication. When she was off her medication, she was notably more depressed and irritable. Tr. at 310-11. At her July 2008 appointment, Plaintiff explained that she discontinued her medication because she misplaced it. Tr. at 305. As a result she became more depressed, irritable, and unable to focus and concentrate. She lost her job at Walmart. However, at her September 2008 appointment, Plaintiff reported that she was doing well with the medication. Tr. at 304. Dr. Ajit's medical records reflect that Plaintiff was alert, oriented, cooperative and well mannered throughout her treatment with him, and she consistently denied any suicidal ideation.

Plaintiff completed a function report dated April 13, 2007 as a part of her application for SSI. According to the report, she attended school for five hours a day on Tuesdays and Thursdays. Tr. at 125. When she was not at school, she spent the time caring for herself, her daughter, and their pets, and doing homework. She had difficulty falling asleep and staying asleep. She has no problem with personal care and prepared her own meals. Tr. at 126. She did all of the house and yard work and got outside "whenever [she] get[s] the chance." Tr. at 127. She did not drive, but she shopped for groceries once a month, a task which took approximately two or three hours to complete. She paid the household bills and oversaw the checkbook. Tr. at 128. Her hobbies included watching television, puzzles, and crafts. Plaintiff did not participate in social activities, except for school, and did not get along with her family. She blamed her attitude and temper. She believed that she was limited in understanding, following instructions, completing tasks, getting

along with others, and sitting. Tr. at 129. She could only sit for four or five minutes, and concentrate for three or four minutes, which made it difficult to accomplish tasks, and she could only get along with others for one or two hours. She had to reread written material to understand it. She had difficulty with authority figures because she was quick to anger. She cannot handle a lot of stress or changes in routine. Tr. at 130. She reported that she shook all the time regardless of what she was doing.

At the hearing, Plaintiff testified that she felt like killing herself every week, but overcame the feeling. Tr. at 342-33. However, she claimed that her depression did not interfere with her ability to care for her daughter. She was taking Adderall, Lamictal. Citalopram (generic Celexa), and Abilify. Tr. at 349. She claimed that she had a difficult time concentrating and keeping her temper. Tr. at 351. She testified that she was easily distracted and that her inability to complete a task caused her frustration. Tr. at 359. She explained that she shared a house with a friend and a boyfriend, but that she and her boyfriend had separate bedrooms. Tr. at 361-63.

In her step three analysis, the ALJ reached the following conclusions regarding the B and C criteria:

> In activities of daily living, the claimant has mild restriction. She takes care of her own personal needs and the needs of her young child and pets, she does housework and cooking, shops, and does crafts.
>
> In social functioning, the claimant has moderate difficulties due to anger issues but she has friends, shops, attends church, works part-time, and was never fired due to problems with getting along.
>
> With regard to concentration, persistence or pace, the claimant has moderate difficulties by self report but she manages her own finances, takes care of her young child, works on crafts, does puzzles, watches television, and needs no reminders to care for herself.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. There is no evidence of decompensations or inpatient psychiatric hospitalizations since she filed her application for benefits.
>
> Because the claimant's mental impairments do not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.
>
> The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria.

Tr. at 19.

Plaintiff contends that "the ALJ improperly attempted to interpret the psychiatric evidence without any psychiatric background or training . . . Perhaps in acknowledgment that she was unable to interpret the raw psychiatric evidence available, she gave overwhelming weight to [Plaintiff's] own function report." ECF Dkt. #9, p. 45. Plaintiff relies almost exclusively on the initial assessment dated August 30, 2006 from CCC, which was completed after Plaintiff had discontinued Lithium and Adderall because of her pregnancy, to argue that the ALJ selectively chose evidence from the record to conclude that Plaintiff does meet the requirements of the B criteria. Plaintiff cites the initial assessment from CCC and Dr. Ajit's medical records during Plaintiff's treatment when she had stopped taking her medication during her pregnancy to demonstrate that Plaintiff had marked limitation in the B criteria. She underscores the fact that she was terminated from her employment at Wal-Mart shortly after she completed the function report.

To the contrary, the ALJ's conclusions are supported by the medical records in this case. When Plaintiff was taking her medication, Dr. Ajit consistently observed that she was alert, oriented, cooperative and well mannered. His records reflect that Plaintiff struggled with behavioral problems when she stopped taking the medication during her pregnancy, and throughout 2007 and 2008, when she would occasionally discontinue it. As a matter of fact, Plaintiff appears to have lost her job at Wal-Mart during a time when she was either not taking her medication at all, or taking it inconsistently. Although Plaintiff complained of depression, anxiety, and lack of sleep after the birth of her daughter, Dr. Ajit did not express any heightened concern for her welfare or the welfare of her daughter. Moreover, Plaintiff has not cited any part of the record where Dr. Ajit contradicted the findings of Drs. Goeke and Waddell that Plaintiff did not meet the B criteria. To the contrary, the findings of Drs. Goeke and Waddell are consistent with Dr. Ajit's medical records and Plaintiff's function report. Because there is substantial evidence to support the ALJ's conclusions at step three of the analysis, Plaintiff's argument that she relied upon her own lay opinion is not well-taken.

In her second argument, Plaintiff contends that a medical expert ("ME") should have been present at the hearing to assist the AJL understand and evaluate medical problems. MEs are

physicians, mental health professionals and other medical professionals who provide impartial expert opinion at the hearing level on claims under Title II and Title XVI of the Social Security Act by either testifying at a hearing (in person, by telephone, or by video teleconference) or responding in writing to interrogatories. The need for ME opinion is left to the ALJ's discretion. HALLEX I-2-5-32 (September 28, 2005).

The primary function of an ME is to explain medical terms and the findings in medical reports in more complex cases in terms that the ALJ, who is not a medical professional, may understand. *Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420 (1972). The Commissioner's regulations provide that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of [the claimant's] impairment(s) and on whether [the] impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. §404,1527(f)(2)(iii). The Commissioner's operations manual indicates that it is within the ALJ's discretion whether to seek the assistance of a medical expert. HALLEX I-2-5-32 (September 28, 2005). "The primary reason an ALJ may obtain ME opinion is to gain information which will help him or her evaluate the medical evidence in a case, and determine whether the claimant is disabled or blind." *Id.* According to the operations manual, an ALJ "may[3] need to obtain an ME's opinion" in the following circumstances:

> the ALJ is determining whether a claimant's impairment(s) meets a listed impairment(s);
>
> the ALJ is determining the usual dosage and effect of drugs and other forms of

---

[3]The ALJ must obtain an ME's opinion, either in testimony at a hearing or in responses to written interrogatories:

> When the Appeals Council or a court so orders.
>
> To evaluate and interpret background medical test data. (See I-2-5-14 D., Medical Test Data.)
>
> When the ALJ is considering a finding that the claimant's impairment(s) medically equals a medical listing.

HALLEX I-2-5-34 (September 28, 2005).

> therapy;
>
> the ALJ is assessing a claimant's failure to follow prescribed treatment;
>
> the ALJ is determining the degree of severity of a claimant's physical or mental impairment;
>
> the ALJ has reasonable doubt about the adequacy of the medical record in a case, and believes that an ME may be able to suggest additional relevant evidence;
>
> the medical evidence is conflicting or confusing, and the ALJ believes an ME may be able to clarify and explain the evidence or help resolve a conflict;
>
>> the sigificance of clinical or laboratory findings in the record is not clear, and the ALJ believes an ME may be able to explain the findings and assist the ALJ in assessing their clinical significance.

HALLEX I-2-5-34 (September 28, 2005). An administrative law judge's determination of whether a medical expert is necessary is inherently a discretionary decision. *Simpson v. Commissioner of Social Security*, 2009 WL 2628355 (6th Cir. August 27, 2009) (unreported) at *8. An administrative law judge abuses his discretion only when the testimony of a medical expert is "required for the discharge of the ALJ's duty to conduct a full inquiry into the claimant's allegations. See 20 C.F.R. § 416.1444." *Haywood v. Sullivan*, 888 F.2d 1463, 1467-68 (5th Cir.1989).

Plaintiff relies upon an unreported case from the Southern District of Ohio to conclude that the ALJ in this case should have sought the assistance of an ME. In *Wise v. Astrue*, 2010 WL 3075184, the ALJ concluded that there was insufficient evidence of serious depression to warrant an ME. The ALJ wrote, "Any [ME] opinion would be too speculative given the lack of substantial evidence to support a finding of disability." *Id.* at *2. However, on appeal, the district court concluded that the AJL "failed to fairly characterize" the treatment records of Wise's treating physician. As a matter of fact, Wise's treating physician completed a mental residual functional capacity assessment in which he concluded that Wise had marked limitations in all four categories of the Subpart P, Appendix 1, and extreme limitations with social interaction and her ability to tolerate customary work pressures. *Id.* at *5. The *Wise* Court found that an ME would have assisted the ALJ to properly characterize the treating physician's records and to accord controlling weight to the treating physician's well-supported findings.

As stated earlier, the medical records in this case support the ALJ's conclusion at step three. Unlike the facts in *Wise*, the ALJ's conclusions are not at odds with the medical evidence, and, therefore, they do not evince the need for an ME to assist the ALJ's interpretation of the records. Accordingly, Plaintiff's second argument also lacks merit.

## VI.  CONCLUSION

For the foregoing reasons, the undersigned AFFIRMS the Commissioner's decision and dismisses Plaintiff's complaint with prejudice.

DATE: September 23, 2011

              */s/George J. Limbert*
              GEORGE J. LIMBERT
              UNITED STATES MAGISTRATE JUDGE